**No. 26-1774**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in the official capacity as Governor of the Commonwealth of Pennsylvania,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in the official capacity as president of the United States; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting U.S. Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in the official capacity as Commissioner of the United States Social Security Administration; UNITED STATES POSTAL SERVICE; DAVID STEINER, in the official capacity as Postmaster General and Chief Executive Officer of the Postal Service; DOUG TULINO, in the official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in the official capacity as Chair of the Postal Service Board of Governors; DEREK T. KAN, in the official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in the official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in the official capacity as a Member of the Postal Service Board of Governors,,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Massachusetts

---

## EMERGENCY MOTION FOR STAY PENDING APPEAL

---

BRETT A. SHUMATE
*Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
BRAD HINSHELWOOD
LAURA E. MYRON
SAMUEL HOBBS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

STATEMENT....................................................................................................................3

ARGUMENT ....................................................................................................................7

    A.    The Government Is Likely to Succeed on the Merits Because the District Court Lacked Jurisdiction ..................................................................7

    B.    The Equitable Factors Favor a Stay. ...........................................................18

CONCLUSION ................................................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

Plaintiffs challenge Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) (EO or Order), which is an internal directive from the President to subordinates in the Executive Branch, and does not itself change the rules of any election. Section 3(b) of the Order calls for the United States Postal Service (USPS) "to initiate a *proposed* rulemaking" regarding mail-in ballots. EO § 3(b) (emphasis added). And Section 2(a) contemplates that the Department of Homeland Security (DHS) will create lists of individuals residing in each State who are citizens and who will be 18 at the time of an upcoming federal election—but only to the extent "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." *Id.* § 2(a). Much remains uncertain—even within the Executive Branch—as to what the lists (if any) will look like or be used for, and what a final rule might be.

The district court correctly dismissed as premature plaintiffs' challenges to the Order regarding elections occurring after November 2026, recognizing that "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' [State] Citizenship Lists, and what final rule, if any, will be adopted by the USPS." Dkt. 190, at 10. And a district court in the District of Columbia recently denied a preliminary injunction in a parallel challenge on the same grounds. *See DSCC v. Trump*, No. 25-cv-1114, 2026 WL 1487833 at *13 (D.D.C. May 28, 2026). Here, the district court nevertheless held that

plaintiffs could challenge the Order as to the November 2026 election now, that Sections 2 and 3 of the Order are "legally void" as *ultra vires* and violate the separation of powers, and enjoined the federal defendants from implementing those sections of the Order with respect to the November election. *See* Dkt. 191, at 34-37.

That holding is gravely mistaken. The same uncertainties that render plaintiffs' suit premature as to future elections apply equally to the November 2026 election. Plaintiffs' purported injuries flow not from the Order itself, but from potential future actions agencies may take to implement it. And in those circumstances—where it is plain that "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy" is "no more than conjecture"—the "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Trump v. New York*, 592 U.S. 125, 131, 134 (2020) (per curiam) (quotation omitted). To that end, the Supreme Court recently stayed a preliminary injunction in a similar challenge to an Executive Order that directed agencies to take certain actions consistent with applicable law, with Justice Sotomayor writing separately to emphasize that plaintiffs should challenge the ultimate implementation of the Order, not the Order itself. *See also Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring). While agency actions to implement EO 14,399 may be subject to challenge if and when they are finalized, the federal defendants are irreparably harmed by *this* injunction, which, absent a stay, will prevent them from completing the necessary administrative procedures and processes to achieve

implementation of the Order for the November 2026 election, even if they were successful on appeal.

A stay pending appeal is warranted. Because the district court granted an administrative stay through July 14, the government respectfully requests relief by that date. If this Court denies relief, defendants respectfully request that it extend the administrative stay to allow time to seek relief, if necessary, from the Supreme Court. Plaintiffs oppose this motion.

## STATEMENT

**1.** As relevant here, the Executive Order does three things:

First, Section 2(a) directs the Secretary of Homeland Security, to the extent feasible and consistent with applicable law, to compile from various federal record sources a list of U.S. citizens above the age of 18 at the time of an upcoming federal election and residing in the state to be provided to the States. *See* EO § 2(a). The Order specifically contemplates that the Secretary will establish procedures for individuals to access, update, or correct their own records and for States to supplement or suggest modifications to the lists. These "State Citizenship Lists" are to "be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal Election." *Id.* § 2(a). The Order does not specify any particular purpose or intended use for the lists once transmitted.

Second, Section 3 of the Order directs USPS "to initiate a proposed rulemaking" regarding certain design requirements for ballot mail for Federal elections

3

and to develop procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]." EO § 3. Those lists would be distinct from the State Citizenship Lists. The Order directs the Postal Service to begin the proposed rulemaking "within 60 days of" the Order with a final rule to be issued within 120 days—by July 29, 2026. *Id.* §§ 3(b), (d). The Order identifies some proposed provisions for inclusion in the notice of proposed rulemaking, *id.* § 3(b), but does not say anything about whether any or all those provisions should also appear in any final rule. On June 2, 2026, the Postal Service issued its notice of proposed rulemaking, and the comment period closed on July 2. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026).

Third, the Order tasks the Attorney General and the heads of executive departments to take "all lawful steps to deter and address noncompliance with Federal law." EO § 5. The Order outlines some priorities for "investigation and, as appropriate, prosecution" of State and local officials or others involved in the administration of Federal elections who issue ballots to individuals not eligible to vote under several relevant statutes. *Id.* § 2(b).

**2.** On April 3, 2026—three days after the Order was issued—plaintiff States filed this suit. They challenge Sections 2, 3, and 5 of the Order, invoking

4

various constitutional theories. *See* Dkt. 1, at ¶¶ 120-205.[1] On June 18, 2026, the district court partially granted and partially denied the federal defendants' motion to dismiss the case on ripeness grounds. *See* Dkt. 190. The court explained that with respect to elections after November 3, 2026, "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO including the source and accuracy of DHS' [State] Citizen[ship] Lists, and what final rule, if any, will be adopted by the USPS." *Id.* at 10. Any challenge to the EO for elections after November 2026 would be unripe, the court recognized, because "[t]he implementation of the EO may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that could result in their concerns being incorporated in agency decision making." *Id.* The court concluded, however, that because the Order contemplates that certain actions will occur prior to the November 2026 election, the plaintiffs' challenge to the legality of the Order as it relates to that election was ripe for adjudication. *See id.* at 11-16.

---

[1] On April 2, 2026, several organizational plaintiffs filed a similar suit challenging the entire Order. *See League of Women Voters of Massachusetts, et al. v. Trump, et al.*, No. 26-cv-11549 (D. Mass.). That case remains pending. The U.S. District Court for the District of Columbia is also considering three consolidated challenges to the Order and has denied a preliminary injunction request. *DSCC v. Trump*, No. 26-cv- 1114 (D.D.C. Apr. 1, 2026), *League of United Latin American Citizens v. Exec. Office of the President*, No. 26-cv-1132 (D.D.C. Apr. 2, 2026), and *NAACP v. Trump*, No. 26-cv-1151 (D.D.C. Apr. 3, 2026). One group of plaintiffs appealed that denial. *See DSCC v. Trump*, No. 26-5193 (D.C. Cir.).

On June 25, 2026, the district court granted summary judgment for plaintiffs and issued a permanent injunction.  Dkt. 191.  The court held that the state plaintiffs have standing because they have "statutory obligations" that "require immediate action" to prepare to respond to federal implementation of the Order.  *Id.* at 15.  As relevant here, the court declared Sections 2 and 3 of the order "legally void," *id.* at 34. In doing so, the court rejected arguments that the Order's multiple saving clauses directing implementing officials to comply with the law rendered the Order not facially unlawful. *Id.* at 23-24. The court held that Section 2(a) was unlawful, reasoning that the President lacked authority to compile voter lists for each State and to limit "voting eligibility in primary elections to citizens above the age of 18" through the lists.  *Id.* at 27 (emphasis omitted).  The court also concluded that no federal statute "authorize[s] the federal government to create their own voting database."  *Id.* at 28. Moreover, the court concluded that Section 2(b) impermissibly sought to "intimidate local election officials to use the necessarily incomplete [State Citizenship Lists] as a resource, lest they face criminal prosecution."  *Id.* at 30.

With respect to Section 3, the court described the Order as directing the Postal Service "to compile its own Lists of individuals eligible to vote by mail and [to] prohibit[] the transmission of a mail-in ballot completed by anyone not on [the Postal Service's] Lists."  *Id.* at 30.  The court held this directive interfered with the States' exclusive "power to determine voter eligibility."  *Id.*  The court also concluded that the Postal Service "lacks statutory authorization to promulgate any binding regulations

6

on mail-in voting." *Id.* The court thus enjoined Defendants, excepting the President, "from implementing or giving effect to Sections 2 and 3 of the Order with respect to the November 3, 2026 or any earlier federal election in the Plaintiff States." *Id.* at 34.

**3.** On July 1, defendants sought a stay pending appeal in district court. Dkt. 193. On July 7, the district court denied the request largely for reasons it had previously articulated, but granted a 7-day administrative stay. *See* Dkt. 208.

## ARGUMENT

A stay pending appeal is warranted because the government is likely to succeed on the merits, will face irreparable injury, and the equities support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A. The Government Is Likely to Succeed on the Merits Because the District Court Lacked Jurisdiction.

This litigation—initiated just three days after the President signed Executive Order 14,399—is premature. The Executive Order functions as an internal directive from the President to subordinate officials and agencies to engage in future policymaking. Plaintiffs' real concern is not with the Executive Order itself—which does not require anyone outside the government to do (or refrain from doing) anything—but with possible harms that may arise depending upon what specific actions the agencies ultimately decide to take when they implement the President's directives. In dismissing many of plaintiffs' claims as premature, the district court could not have stated the point more accurately: "[t]here are clearly many

7

uncertainties as to how the agencies will ultimately implement the EO including the source and accuracy of DHS' [State] Citizen[ship] Lists, and what final rule, if any, will be adopted by the USPS," and "implementation of the EO may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that could result in their concerns being incorporated in agency decision making." Dkt. 190, at 10. The same reasoning plainly counsels in favor of a stay.

It is no less "uncertain[] … how the agencies will ultimately implement the EO" as to the November 2026 election. Dkt. 190, at 10. As another district court recognized in holding premature functionally identical claims, "the Executive Order does not command Plaintiffs to do anything," "no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs," and plaintiffs thus "have not suffered any harm at present, much less harm that is certain, great, and imminent." *DSCC v. Trump*, No. 25-cv-1114, 2026 WL 1487833 at *13 (D.D.C. May 28, 2026) (quotation marks omitted). The district court here nonetheless allowed the challenge to the Order to proceed as to its implementation for the November 2026 election. That conclusion is contrary to law and logic.

**1.** This suit is premature. Two "related doctrines of justiciability" that "each originat[e] in the case-or-controversy requirement of Article III"—standing and ripeness—render this suit premature. *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). To establish standing, a plaintiff must show (i) an injury in fact that is

"concrete, particularized, and actual or imminent"; (ii) that was "likely caused by the defendant"; and (iii) that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."  *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

"[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  Ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and shields "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."'  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and quotation marks omitted).

Whether viewed through the prism of standing or ripeness, plaintiffs have failed to establish any present injury that a court could properly remedy.  Executive Order 14,399 is an intra-Executive Branch directive from the President to his

9

subordinates—which, of its own force, does not change anything at all about elections in any State.  It does not require the States to do (or refrain from doing) anything at all.  And as the district court acknowledged, there remain "many uncertainties" about how the agencies will implement the Order.  Dkt. 190, at 10.  Plaintiffs fear potential future injury from action agencies may eventually take—in other words, from "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas*, 523 U.S. at 300.

Take each provision in turn.  Section 2(a) does not alter the rules of any State's election processes.  It directs the Secretary of Homeland Security—to the extent "feasible and consistent with applicable law"—to "take appropriate action to compile" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State" using existing federal records, and to "transmit" that list to the chief election official of each State.  EO § 2(a).  Section 2(a) by its plain terms contemplates that DHS may determine that the creation or transmission of these lists is not "feasible" or "consistent with applicable law."  *Id.*  Indeed, as the district court acknowledged in a footnote, DHS's recent statement on its implementation of the Order made clear that, even under the current proposed approach, discussions remain ongoing regarding the extent and manner in which information can be shared consistent with the Privacy Act and other applicable laws.  Dkt. 191, at 26-27 n. 15; *see also* Dkt. 188-1, at 5.  Moreover, the Order does not

require the States to do anything with the Lists if and when they are transmitted, and certainly does not "prescribe who should be included on State voter lists" or constitute creation of a federal voter database. Dkt. 191, at 28.

Likewise, Section 3(b) simply directs USPS to initiate a rulemaking process regarding the acceptance and transmission of mail-in and absentee ballots through the Federal mails. Although the Executive Order proposes terms for the proposed rule and sets forth a specific timeline for completing the rulemaking process, EO § 3(b), (d), the content of any final rule is not in any way dictated by the Order. Rather, like all notice-and-comment rulemaking, any final rule (if and when it issues) will be developed after USPS receives and considers public comments. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013) (observing that "Article III standing requires more than the possibility of potentially adverse regulation" and that plaintiffs are not injured "by the initiation of a rulemaking").

Plaintiffs cannot demonstrate they suffer any particularized injury from ongoing policymaking deliberations within the Executive Branch. Instead, their concern is with possible "action that the [government] *might* take in the future." *Trump v. New York*, 592 U.S. at 133-34. Thus, this suit is indistinguishable from the suit the Supreme Court dismissed as premature in *Trump v. New York*. There, President Trump issued a memorandum that "announced a policy of excluding from the apportionment base aliens who are not in a lawful immigration status'" for the 2020 decennial census. *Id.* at 129-30 (quotation marks omitted). That directive also

11

called for "implementation to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* The Supreme Court rejected a challenge brought prior to implementation of the memorandum, holding that the "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. The Court acknowledged the memorandum outlined policy priorities, but concluded that because "the President qualified his directive by providing that the Secretary should gather information to the extent practicable and that aliens should be excluded to the extent feasible," "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] no more than conjecture at th[at] time." *Id.* at 131 (quotation marks omitted). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132.

Exactly the same is true here, including the important qualifications that any actions taken be "feasible and consistent with applicable law, including but not limited to the Privacy Act." *See* EO §§ 2(a), 4(c), 3(b)(iv), 7(b). Any resulting injury to plaintiffs will depend on whether and how the policy directives are implemented subject to these qualifications. The district court's attempted to distinguish *New York* as involving a "request for the Commerce Secretary to implement a policy statement" in contrast to the Order's "specific directives" about actions to take "at specified times" with "definite substantive outcomes," Dkt. 190, at 16 (quotation omitted),

12

ignores both *New York* and the Order here.  The timeframe for apportionment in *New York* was set by statute, *see* 2 U.S.C. § 2a, 13 U.S.C. § 141, and the President's memorandum both specifically stated a hoped-for policy outcome and directed the Commerce Secretary—as in the Order here—to achieve that policy objective "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," *New York*, 592 U.S. at 129-30.  The Supreme Court also recently stayed a preliminary injunction in an analogous challenge to an Executive Order that directed agencies to take certain actions consistent with applicable law, with Justice Sotomayor writing separately to emphasize that plaintiffs should challenge the ultimate implementation of the Order, not the Order itself.  *See also Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring).

**2.** Here, as in *New York*, "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction."  592 U.S. at 133.  The district court's erroneous assessment of justiciability was affected by errors in mischaracterizing the Executive Order as impossible to implement lawfully.  *See* Dkt. 191, at 23-32.  At the outset, *New York* makes clear that a claim that a particular policy directive cannot be implemented lawfully does not displace the basic obligation to show a justiciable controversy; the plaintiffs there asserted that the President's policy, if implemented, would result in "an invalid tabulation" that "would contravene the requirement … that the President state the 'whole number of persons in each State' for purposes of apportionment," 592

13

U.S. at 130 (citation omitted), but the Court nevertheless concluded the dispute was not justiciable.

Here, it is inconceivable that there is *no* possible DHS list and *no* possible USPS mail-ballot rule that could be lawful and consistent with the Order. Indeed, the district court itself did not itself reach that conclusion and instead relied on several mischaracterizations of the Order to conclude it was impossible to implement lawfully. For example, the district court concluded that the creation of State Citizenship Lists would be unlawful because "the President lack[s] any role regarding voter eligibility," Dkt. 191, at 27, and does not have "any authority to compile voter lists for each State," *id.* at 28. But the Order simply directs DHS (to the extent feasible and consistent with applicable law) to transmit a list of "individuals confirmed to be United States citizens" of the relevant age and residency. EO § 2(a). That is not a "voter list for each State," Dkt. 191, at 28; omission from a State Citizenship List would not by itself confirm non-citizenship, or ineligibility to vote under State or federal law, just as presence on the list would not "indicate that the individual has been properly registered to vote in the State." *Id.*

The district court's belief that the Order "directs that USPS require all States to use a specific mail-in ballot," Dkt. 191, at 31, is of a piece. Such a directive appears nowhere in the Order, which instead simply directs the Postal Service "to initiate a *proposed* rulemaking" setting forth standards for transmitting mail-in or absentee ballots, including certain requirements for envelope design, EO § 3(b); instructs that

any ultimate implementation should be "consistent with applicable law," *id.* § 7(b); and neither speaks to voter eligibility nor dictates that a "specific mail-in ballot" be used.

The district court similarly erred by declining to give effect to the Order's repeated instructions that its directives should be carried out only to the extent "feasible" and "consistent with applicable law." EO §§ 2(a), 4(c), 3(b)(iv), 7(b). The district court acknowledged the usual rule that "[t]he mere possibility that some agency might make a legally suspect decision does not justify an injunction against enforcement" of that order, *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *see* Dkt. 191, at 23, but declined to apply it because of its view that the Order "is invalid in all possible applications," Dkt. 191, at 24. *Trump v. New York* explicitly rejects virtually identical reasoning—placing nearly dispositive weight on materially indistinguishable language as warranting dismissal on both standing and ripeness grounds. 592 U.S. at 131 (emphasizing that "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible'"). That is quite different from the Presidential directive in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), which was a self-executing order that expressly directed seizure of plaintiff's steel mills, and thus was not contingent on future implementing action. *See Allbaugh*, 295 F.3d at 33. And although this Court has declined to apply the ordinary rule where "record evidence" demonstrated a

15

"consistent way that the intended recipients" of a directive understood it to command unlawful action—and then actually implemented assertedly unlawful action—nothing of the sort can be said here, where no agency has yet implemented the Order. *New York v. Trump*, 171 F.4th 1, 23 (1st Cir. 2026).

The district court fared no better in suggesting that this case could proceed because plaintiff States are "actively working to conduct primary, special, and general elections," Dkt. 191, at 16, and have chosen to divert resources to, for example, "analyze and develop a compliance plan for the EO," *id.* at 15.  Courts have never regarded parties' bare assertions that they have spent time and energy evaluating how to comply with some possible future regulation or change in agency behavior as rendering otherwise nonjusticiable controversies capable of resolution.  Instead, the Supreme Court has repeatedly held that plaintiffs cannot manufacture a cognizable injury *now* by incurring costs to guard against potential *future* injury.  *See Clapper*, 568 U.S. at 410; *id.* at 402 (holding plaintiffs may not "manufacture standing in anticipation of non-imminent harm"); *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024) (organizations "cannot spend [their] way into standing" by expending "'considerable resources'" on steps like "public advocacy and public education" to "the detriment of other spending priorities").

States's voluntary decisions to divert resources in anticipation of possible future agency actions cannot render this controversy presently justiciable given the acknowledged uncertainties as to agency implementation.  To the extent plaintiffs

16

anticipate they may incur additional compliance costs if a final Postal Service rule ultimately requires them to redesign their ballot mail, this only underscores why plaintiffs' challenge is not yet ripe. *See* Dkt. 191, at 16. This concern is properly raised through comments in the Postal Service rulemaking process; such anticipated, potential expenditures cannot support a challenge now.

Finally, the district court was also incorrect to interpret the EO as creating an imminent threat of criminal enforcement "against election officials who furnish ballots to voters excluded from the [State Citizenship] Lists or the USPS Lists." Dkt. 191, at 16. The Order simply directs the Attorney General to prioritize investigations into violations of certain existing federal laws against election officials who issue ballots to individuals "not eligible to vote in a Federal election." EO § 2(b). But it expressly defines an individual as "'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the law of his or her State." *Id.* Nothing in the Order suggests that eligibility or enforcement will be tied to any list created either by DHS or the Postal Service at the conclusion of agency decision-making. Plaintiffs cannot sue to enjoin the President from directing his subordinates to prioritize enforcement of certain existing statutes over others. *See United States v. Texas*, 599 U.S. 670, 678-79 (2023) ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."); *TransUnion*,

594 U.S. at 429 (explaining that the Executive Branch determines "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law").

Once the district court's misinterpretations are corrected, it is plain that the Order is not self-executing. As another district court observed in denying a preliminary injunction, the Order "does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted," and "whether the government's actions under the Order are lawful or unlawful will depend on how" the Postal Service and DHS "decide to implement the Order, not on the Order itself." *See DSCC*, 2026 WL 1487833 at *11-12. Applying these settled principles of justiciability does not foreclose the possibility of future judicial review. The agencies may eventually take action that directly affects plaintiffs. Any concretely injured plaintiff can sue at that time. But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review," *Trump v. New York*, 592 U.S. at 131, and "Federal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing," *McInnis-Miesnor v. Maine Medical Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003) (quotation omitted).

### B. The Equitable Factors Favor a Stay.

Federal defendants are irreparably harmed absent a stay because there is insufficient time to obtain meaningful review. Because certain final agency actions must be in place well before November 3, 2026, to be available for the upcoming

general election, if the agencies are unable to continue work during the pendency of an appeal, they will be effectively deprived of relief even if they eventually prevail.

For example, USPS advises that it has received numerous comments in response to its Notice of Proposed Rulemaking. Absent a stay, it likely will not be able to complete a final rulemaking in time to be applicable to the November 3, 2026 election, even for non-plaintiff States. *See* Dkt. 194-2, at ¶ 4 (Monteith Decl.). This is because the Postal Service "operates a nationwide network and provides nationwide guidance with respect to Election Mail" and is operationally unable to implement a "two-tiered system" for plaintiff States and non-plaintiff States. *Id.* ¶ 5. The same applies to the USPS's new portal that would allow election officials "to provide their lists to the Postal Service of voters who are mailed ballots for Federal elections." *Id.* ¶ 7. As to the DHS portal for citizenship verification, "Plaintiff states will be denied access to voter verification information that will be available to the non-Plaintiff states through the November 3, 2026 election." *See* Dkt. 149-1, at ¶ 8 (Mayhew Decl.). And absent a stay, "USCIS will not be able to fully implement the E.O. in time for the upcoming elections." *Id.* ¶ 10. The district court brushed aside these concerns, noting that the injunction did not prevent defendants from implementing the Order with respect to elections after November 2026. *See* Dkt. 208 at 5. But that wholly misses the point: the irreparable harm to the defendants is the inability to implement the Order as to the November 2026 general election.

19

The injunction also irreparably and impermissibly inhibits the President's ability to oversee the Executive Branch. Such an order irreparably harms federal defendants, given the Framers' decision to vest all "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).

On the other side of the balance, plaintiffs face no irreparable harm for the same reasons they have failed to show a justiciable controversy: at least at this time, they merely seek to prevent hypothesized harm based on speculation about a series of future contingencies that have not yet come to pass and may never come to pass. *See DSCC*, 2026 WL 1487833 at *13.

20

## CONCLUSION

This Court should grant a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
 */s/ Laura E. Myron*

LAURA E. MYRON
SAMUEL HOBBS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

July 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,169 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Laura E. Myron*
LAURA E. MYRON