No. 26-1774, 26-1779

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF CALIFORNIA, *et al.*,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellees,*

STATE OF ALABAMA, *et al.*,

*Intervener Defendants-Appellants,*

---

Appeal from the U.S. District Court for the District of Massachusetts
(1:26-cv-11581-IT)

---

## STATE APPELLANTS' EMERGENCY MOTION TO STAY

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL
Louis J. Capozzi, III, #1215872
  *Solicitor General*
Graham D. Miller, #1222440
  *Deputy Solicitor General*
J. Michael Patton, 1223909
  *Deputy Solicitor General*
Benjamin S. Gilberg, #1223910
  *Deputy Solicitor General*
815 Olive Street, Ste. #200
St. Louis, Missouri 63101
Tel. (573) 645-9662
Louis.Capozzi@ago.mo.gov
*Counsel for the State of Missouri*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

INTRODUCTION............................................................................................ 1

STATEMENT OF THE CASE ........................................................................ 2

STANDARD OF REVIEW............................................................................. 7

ARGUMENT ................................................................................................... 7

    I. Intervener States Are Likely to Prevail on the Merits of Their Appeal. ....................................................................................................... 7

        A.  Appellees' claims are premature. ............................................. 7

        B.  Appellees have not identified any injury to challenge Section 2(a)................................................................................ 11

        C.  Appellees have not identified any injury to challenge Section 3(b)................................................................................ 14

        D.  The injunction against directing USPS to engage in rulemaking is unconstitutional. ............................................. 17

    II.  Intervener States Will Suffer Irreparable Harm Absent A Stay. ........................................................................................................ 20

    III. The Balance of Equities and Public Interest Favor Granting a Stay. ........................................................................................................ 21

CONCLUSION .............................................................................................. 23

CERTIFICATE OF COMPLIANCE........................................................... 27

CERTIFICATE OF SERVICE...................................................................... 28

i

# TABLE OF AUTHORITIES

### Cases

*Abbott Lab'ys. v. Gardner,*
  387 U.S. 136 (1967)......................................................................8

*Alaska v. U.S. Dep't of Agric.,*
  17 F.4th 1224 (D.C. Cir. 2021)..................................................... 10, 15

*Allen v. Wright,*
  468 U.S. 737 (1984)....................................................................13

*Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of
  Am. v. Wis. Emp. Rels. Bd.,*
  315 U.S. 740 (1942).....................................................................22

*Am. Petroleum Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012) ....................................................... 8, 11

*Bennett v. Spear,*
  520 U.S. 154 (1997)....................................................................15

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)............................................................. 7, 8, 12, 13

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. 2020) ................................... 10, 11, 21, 22

*DSCC v. Trump,*
  2026 WL 1487833 (D.D.C. May 28, 2026) .........................................22

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)................................................................. 18, 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010).....................................................................18

*Gordon-Darby Holdings, Inc. v. Quinn,*
  174 F.4th 255 (1st Cir. 2026)...............................................................7

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015) ............................................................... 15

*Myers v. United States*,
272 U.S. 52 (1926) ...................................................................... 18, 19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ............................................................................. 7

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ............................................................................. 10

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ........................................................ 21

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ............................................................................. 20

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ......................................................................... 21

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) ........................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................... 11

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ............................................................ 16

*Trump v. New York,*
592 U.S. 125 (2020) ............................................................... 9, 14, 22

*Trump v. Slaughter*,
No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ......................... 19

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999) ........................................................... 11

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 ........................................................................18

U.S. Const. art. II, § 3 ...................................................................................18

## Statutes

5 U.S.C. § 704 ................................................................................................15

18 U.S.C. § 2(a) ........................................................................................ 3, 8, 9

18 U.S.C. § 241 ................................................................................................3

18 U.S.C. § 371 ................................................................................................3

18 U.S.C. § 611 ...........................................................................................3, 18

18 U.S.C. § 1001 .............................................................................................3

18 U.S.C. § 1015 .............................................................................................3

39 U.S.C. § 401 ..........................................................................................3, 15

52 U.S.C. § 10307 ...........................................................................................3

52 U.S.C. § 20511 ......................................................................................3, 18

## Regulations

Ballot Mail for Federal Elections,
   91 Fed. Reg. 32,915 (June 2, 2026) .................................................... 4, 5

## **INTRODUCTION**

This Court should stay the District Court's injunction against Executive Order 14399 ("the EO") because Intervener States are likely to prevail on the merits, they would be irreparably harmed absent a stay, and the balance of equities and public interest favor the stay. Fundamentally, Appellees' claims are all premature.  As the District Court correctly acknowledged, "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS."  Doc. 190 at 10.  For this reason, Appellees' claims are not ripe.  Moreover, Intervener States have a concrete interest in ensuring that mail ballots cast by their voters are securely delivered and counted, which would be irreparably undermined if USPS is not given an opportunity to implement the EO.  Finally, the balance of equities weighs in favor of giving agencies a chance to implement lawfully policies pending appeal—whereas Appellees are not meaningfully harmed by having to wait for finalized policies.

The Court should grant a stay pending appeal.

## STATEMENT OF THE CASE

### I.    Factual Background

On March 31, 2026, President Trump issued Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections.*  The EO recognized the President's "duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1.  As relevant to the appeal in this case, the EO furthers these ends in three main ways.

First, Section 2(a) of the EO directs federal agencies to create "State Citizenship Lists" and to transmit the Lists to "State election officials," "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a).  The State Citizenship Lists are simply lists of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.*  Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update

2

or correct them in advance of elections." *Id.* As of the date of this filing, it is still unknown precisely which databases federal agencies will use. Doc. 188-1. It is also unknown which States will choose to use the State Citizenship Lists, and how States would use the Lists. *Id.*

Second, Section 2(b) of the EO directs the Attorney General to "prioritize the investigation" and "prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. § 2(a), 18 U.S.C. § 241, 18 U.S.C. § 371, 18 U.S.C. § 611(a), 18 U.S.C. § 1001, 18 U.S.C. § 1015, 52 U.S.C. § 10307, and 52 U.S.C. § 20511."

Third, Section 3 of the EO requires the U.S. Postal Service (USPS) to initiate rulemaking under 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee ballots. Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail. Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals.

Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals . . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers."

The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements." EO § 3(b)(iv). Section 3(b)(v) then directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law." Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order."

There is no final USPS rule as of the date of this filing. On June 2, 2026, USPS published its notice of proposed rulemaking (NPRM) in response to the EO. Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026). Under this proposal, USPS would not send mail ballots to individuals who are not on lists of eligible voters provided by the States. *Id.* at 32,916. Moreover, "states"—not USPS or any agency of the federal government—"would retain full control over who would (or

4

would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." *Id.* "The Postal Service would not change the information provided by the state when compiling the lists" but would rather merely "provide technical assistance to states and localities regarding the secure submission of this data." *Id.*

## II.    Procedural History

The President promulgated the EO on March 31, 2026, and Appellees challenged it almost immediately, filing their original complaint on April 3.  Doc. 1.  Appellees then filed their First Amended Complaint on April 17.  Doc. 65.  On April 23, 2026, Appellees moved for summary judgment, declaratory relief, and permanent injunction.  Doc. 97.

On June 18, 2026, the District Court dismissed without prejudice Plaintiff's First Amended Complaint "as to their claims regarding the EO and its implementation with regard to elections occurring after November 3, 2026" on ripeness grounds, Doc. 190 at 17, explaining that "[t]here are clearly many uncertainties as to how the agencies will

ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS," *id.* at 10. The District Court denied the motion to dismiss "with regard to the November 3, 2026 election, and all earlier elections." *Id.* at 17.

On June 25, 2026, the District Court granted Plaintiffs' motion for summary judgment, declaratory relief, and injunction, holding that "Sections 2 and 3 of the EO are legally void as they are ultra vires and unconstitutionally violate the separation of powers." Doc. 191 at 34. The District Court further enjoined Federal Defendants from implementing or enforcing Sections 2 and 3(b)(i)–(v) or (d) of the EO as to Plaintiff States with respect to the November 3, 2026 or any earlier federal election. *Id.* at 34–36.

The Intervener States timely appealed and filed a motion to stay in the District Court. Docs. 201, 202. The District Court denied the motion but granted a seven-day administrative stay to allow the parties time to file stay motions before this Court. Doc. 208 at 7.

## STANDARD OF REVIEW

This Court considers four factors when deciding a motion to stay an injunction pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Gordon-Darby Holdings, Inc. v. Quinn*, 174 F.4th 255, 258 (1st Cir. 2026) (citation omitted).

## ARGUMENT

**I.     Intervener States Are Likely to Prevail on the Merits of Their Appeal.**

**A.     Appellees' claims are premature.**

Appellees' claims are barred under both the standing and prudential ripeness doctrines. Standing doctrine prohibits litigants from suing before they can prove an "actual or imminent" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Relatedly, the ripeness doctrine prohibits "premature adjudication" of "administrative policies . . . until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp.*

7

*Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148–49 (1967)). To determine whether a claim satisfies prudential ripeness, courts consider: (1) "the 'fitness of the issues for judicial decision'" and (2) "the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Lab'ys.*, 387 U.S. at 149). Assessing whether an issue is "fit[]" for adjudication requires courts to consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (citation omitted).

Here, as the District Court rightly concluded, "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS." Doc. 190 at 10. Thus, Appellees lack standing and fail to establish the first prong for prudential ripeness because no concrete legal dispute yet exists.

*First*, regarding Section 2(a), Appellees' theories of injury turn on speculation about future events. *See Clapper*, 568 U.S. at 409–10, 414 n.5. For example, Appellees presume that the State Citizenship Lists

will be inaccurate because the SAVE database is purportedly incomplete and so "[t]he State Citizenship List will inevitably suffer from the same defects as SAVE." Doc. 65 ¶¶ 133–36. But *even* assuming the SAVE database has inaccuracies, Section 2(a) makes clear that the Lists will be based on *other* sources of information, including "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." EO § 2(a). The parties still do not know *which* databases federal agencies will use, whether those databases will be inaccurate and whether and how States would use those lists. Doc. 188-1.

Appellees' extensive speculation about how Section 2(a) will be implemented dooms their case. The Supreme Court in *Trump v. New York* rejected judicial review of a presidential directive where it included the exact caveat of feasibility and legality present here. *See* 592 U.S. 125, 131–32 (2020) (explaining that where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and [take action] 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" and the order "may not prove feasible to implement in any manner

9

whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here"); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (holding presidential memorandum challenge was unripe where the order included qualifiers that any action taken be only "to the extent feasible" and "to the extent practicable").

*Second*, regarding Section 3(b), while the EO provides a broad outline of what the USPS regulation will include, the administrative process remains ongoing.  It would thus be imprudent (at best) to review an executive order directing rulemaking when it is unknown what the final rule will provide after the notice and comment period.  *See Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1228–29 (D.C. Cir. 2021) (finding a challenge nonjusticiable because the court "cannot presume that any such future rulemaking" would lead to the specific effects the challenger feared).  Indeed, USPS has committed not to implement any of the proposals from Section 3 before completing notice-and-comment rulemaking.  *See* Doc. 156-3 ¶ 5.  That means USPS will be required to accept and weigh ideas submitted in comments.  *Id.*  Agencies must consider changes suggested by commenters.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also* Doc. 190 at 10 ("The

10

implementation of the EO may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that could result in their concerns being incorporated in agency decision making.").

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause*, 506 F. Supp. 3d at 46 (quoting *Am. Petroleum Inst.*, 683 F.3d at 387). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45–46 (first alteration in original) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).

## B. Appellees have not identified any injury to challenge Section 2(a).

To establish standing, Appellees must prove an "'injury in fact'—a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citation omitted). The threatened injury must

11

be "certainly impending." *Clapper*, 568 U.S. at 409–10. A "reasonable likelihood" of future harm is insufficient. *Id.*

Applying these principles here, Appellees lack a cognizable injury caused by Section 2(a). Fatal to their standing theories, Appellees ignore the reality that any use of the State Citizenship List is *optional*. Indeed, Section 2(a) merely orders the provision of information to States. *See* EO § 2(a) (directing the Secretary of Homeland Security to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State"). There is nothing in Section 2(a) ordering the States to take any sort of action with respect to their voting rules based on the State Citizenship List.

The allegation that Section 2 "superintend[s] and control[s] States' maintenance of their voter rolls" is illusory and appears nowhere in the EO's text. Doc. 65 ¶ 154; *see also id.* ¶ 155 (speculating that "[u]pon receipt of the State Citizenship List, state elections officials must either rapidly remove voters from the rolls who are omitted from that list and refuse them a ballot … or face the risk of criminal prosecution"). If a

12

State does not wish to use its State Citizenship List, it can simply decline to do so—without any legal consequences.

Because any use of the State Citizenship Lists is voluntary, Appellees' alleged harms are extraordinarily speculative.  For instance, Appellees allege that Section 2(a) will harm them by "introduc[ing] chaos as the 2026 midterm elections approach, imposing a significant burden on Plaintiff States' electoral systems," *id.* ¶ 139, and that "citizens who access their records on the State Citizenship List and find that they are not listed will likely turn to Plaintiff States with questions about why they are not listed and what," *id.* ¶ 143.  Courts routinely reject these kinds of hypothetical standing theories that speculate about how third parties will respond to government action or that involve multiple contingent links between the challenged conduct and the alleged harm. *See Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976))); *Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about the

13

unfettered choices made by independent actors not before the courts." (quotations and citations omitted)).  This Court should too.

### C.    Appellees have not identified any injury to challenge Section 3(b).

For many of the same reasons as with Section 2(a), Appellees have not pleaded a viable injury-in-fact caused by Section 3(b) of the EO. Standing requires a sufficiently concrete challenged policy to assess the imminence of a threatened injury.  *See Trump v. New York*, 592 U.S. at 131–32.  No final rule has issued yet—precluding imminent harm.  *Cf. id.*  Indeed, Appellees admit that they are uncertain about what a potential USPS rule would provide for, acknowledging that the Executive Order "does not specify how [USPS] 'enroll[ment]' will be effectuated, nor the entity charged with effectuating it."  Doc. 65 ¶ 128 (second alteration in original).

Section 3(b) does not dictate a particular outcome permitting pre-implementation challenges. It rather directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, but the administrative process remains in USPS's hands.  *See* EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled

with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing unspecified "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List").

It is black-letter law that litigants cannot challenge proposed rules before finalization. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015). And for good reasons. With respect to justiciability, a proposed rule can change during the notice-and-comment process—and courts "will not presume that the [agency] is violating the law by going into that process with its mind made up." *Alaska*, 17 F.4th at 1229 n.5. Moreover, like Section 2(a), Section 3 directs that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law"—meaning determinations by USPS remain regarding, *inter alia*, how the Mail-In and Absentee Participation Lists will be compiled and how the enrollment process will work. EO § 3(b)(iv)–(v).

15

Even if Appellees could challenge the non-final rule, their injury theory suffers from the same speculation as their challenge to Section 2(a). In fact, it is worse, as the D.C. District Court aptly explained when denying a motion for preliminary injunction to enjoin the EO in a parallel proceeding: "Unlike Section 2(a)—which does require the agencies to assess whether they can compile and then transmit to the States certain information—Section 3(b) directs only that the Postal Service initiate and then complete a rulemaking. Any injury therefore depends on a series of contingencies", including "what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs." *DSCC v. Trump,* --- F. Supp. 3d ---, 2026 WL 1487833, at *10 (D.D.C. May 28, 2026). Like Section 2(a), any alleged injury caused by Section 3(b) rests on too many unfallen dominoes. *See Tex. State LULAC v. Elfant,* 52 F.4th 248, 257 (5th Cir. 2022).

Since Appellees filed suit and sought injunctive relief, USPS has issued a proposed rule—one which is *quite* different than how Appellees speculated before the District Court—illustrating precisely why rogue speculation has no place in the federal courts. For example, Appellees alleged in their complaint that "Section 3 of the EO grants federal

16

agencies decisive control of this [USPS] list, preventing States from ensuring accuracy." Doc. 65 ¶ 176. But the proposed rule says the opposite. Under the rule being considered, "states"—not USPS or any agency of the federal government—"would retain full control over who would (or would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." 91 Fed. Reg. at 32,916. The proposed rule also expressly states that "[t]he Postal Service would not change the information provided by the state when compiling the lists" but would rather merely "provide technical assistance to states and localities regarding the secure submission of this data." *Id.*

Altogether, this Court should not entertain Appellees' premature lawsuit at the expense of foundational justiciability and administrative-law rules.

### D. The injunction against directing USPS to engage in rulemaking is unconstitutional.

Appellees' challenge to Section 3(b) is likewise unlikely to succeed on the merits because it asks for an impermissible remedy. In enjoining the President from instructing a federal agency to engage in rulemaking,

the District Court has given Appellees an impermissible remedy that violates Article II of the Constitution.

The Constitution vests the entirety of the executive power in the President.  U.S. Const. art. II, § 1, cl. 1.  In exercising this power, the President must be able to control and supervise his subordinates to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).  This includes the laws criminalizing provision of a fraudulent ballot and casting ballots by anyone other than eligible voters.  *See* 18 U.S.C. § 611; 52 U.S.C. § 20511.

The District Court's order is unprecedented and extraordinary.  It bars the President from asking a federal agency to even *consider* policy reforms he deems necessary to execute federal law.  *See* Doc. 207 at 3–4. A judicial order barring the President from supervising agency officials violates Article II and is unconstitutional.  *See Myers v. United States*, 272 U.S. 52, 135 (1926).

This remedy is quite different than a typical administrative law remedy: an order preventing an agency official from implementing a *finalized* policy.  *See Franklin v. Massachusetts*, 505 U.S. 788, 826–28

18

(1992) (Scalia, J., concurring in part and concurring in the judgment). That tried-and-true path at least gives the executive branch a *chance* to implement presidential policy goals consistent with the law. *See id.*

Nor can Appellees justify inhibiting presidential control of USPS by pointing to congressional statutes designed to insulate the agency from presidential control. *See* Doc. 163 at 35–36. The Supreme Court has already made clear that the Constitution prohibits such statutes. *See Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *15 (U.S. June 29, 2026) ("When an agency 'executes' a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it."). Indeed, the Supreme Court already previously held that Congress cannot insulate the U.S. Postal Service from presidential supervision. *See Myers*, 272 U.S. at 135.

Article II of the Constitution therefore provides the President with authority to supervise USPS. Neither Congress nor the courts can interfere—including by prohibiting presidential directions to engage in rulemaking. *See Myers*, 272 U.S. at 135.

19

## II.  Intervener States Will Suffer Irreparable Harm Absent A Stay

Intervener States have a concrete interest in ensuring that mail ballots cast by their voters are securely delivered and counted. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).  This interest will be irreparably undermined absent a stay.  As Federal Defendants have attested, "USCIS will not be able to fully implement the E.O. in time for the upcoming elections" without an immediate stay.  Doc. 194-1 ¶ 10.  In the event of a delayed stay, "USCIS will be required to expend additional resources and perform work under potentially tight timelines to fully implement the E.O. at that time." *Id.*  USPS will also likely be unable to issue a final rule applicable to the November 3, 2026 elections, even for Intervener States, Doc. 194-2 ¶ 4, because USPS "operates a nationwide network and provides nationwide guidance with respect to Election Mail" and operationally is unable to implement a "two-tiered system" where one set of rules applies to some States but not others, *id.* ¶ 5.  This also applies to USPS's new portal that would allow election officials "to provide their lists to the Postal Service of voters who are mailed ballots for Federal elections." *Id.* ¶ 7.  Intervener States cannot implement these

measures themselves, leaving the security of their elections irreparably harmed by the injunction.

## III. The Balance of Equities and Public Interest Favor Granting a Stay

Finally, the equitable factors favor a stay. On Appellees' side of the balance, Appellees can point only to speculative injuries based on non-final agency actions. *See supra* Part I.B–C. Read charitably, Appellees' strongest equitable claim to harm is their conjectural assertion of an "increase[d] . . . risk" of inaccuracy and injury, Doc. 65 ¶ 136, which is insufficient for standing, *see Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'increased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased" (emphasis omitted)).

On the other hand, the federal government has a strong interest in getting a chance to implement executive orders lawfully. *See Common Cause*, 506 F. Supp. 3d at 46. Presidents frequently articulate policy objectives, but they rely on agencies to use their expertise to implement policy ideas lawfully. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020). Giving agencies a chance to implement lawfully policies—rather

21

than reflexively barring presidential directives that do not bind the public—reflects the respect due to the executive branch as a coordinate branch of government. *See Common Cause*, 506 F. Supp. 3d at 46.

At the same time, the federal courts also have a strong interest in not being forced to adjudicate rushed, speculative cases like this one. Federal courts exist to resolve concrete legal disputes based on specific factual circumstances. *See Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of Am. v. Wis. Emp. Rels. Bd.*, 315 U.S. 740, 746 (1942). But as recognized by multiple federal judges, there are still many unknowns about how the EO will be implemented. *See* Doc. 190 at 10 ("There are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS."); *DSCC*, 2026 WL 1487833, at *6, *10. Entertaining challenges to non-final, evolving policies—like Appellees demand—only pulls federal courts away from the foundational principles that constrain and guide judicial power. *See Trump v. New York*, 592 U.S. at 131–32.

22

## CONCLUSION

For the foregoing reasons, this Court should grant the emergency motion to stay.

Date: July 10, 2026                                  Respectfully submitted,

**STEVE MARSHALL**                                   **CATHERINE L. HANAWAY**
ALABAMA ATTORNEY GENERAL                             MISSOURI ATTORNEY GENERAL

/s/ A. Barrett Bowdre                                /s/ Louis J. Capozzi III
A. Barrett Bowdre, 1222562                           Louis J. Capozzi III, #1215872
  *Solicitor General*                                  *Solicitor General*
STATE OF ALABAMA                                      Graham D. Miller, #1222440
OFFICE OF THE ATTORNEY GENERAL                         *Deputy Solicitor General*
501 Washington Avenue                                J. Michael Patton, 1223909
Montgomery, Alabama 36104                              *Deputy Solicitor General*
Telephone: (334) 353-8892                            Benjamin S. Gilberg, #1223910
Fax: (334) 353-8400                                    *Deputy Solicitor General*
Barrett.Bowdre@AlabamaAG.gov                         Missouri  Attorney  General's
                                                     Office
                                                     815 Olive Street, Suite 200
                                                     St. Louis, MO 63101
                                                     Tel. (573) 645-9662
                                                     Fax (573) 751-0774
                                                     Louis.Capozzi@ago.mo.gov
                                                     Graham.Miller@ago.mo.gov
                                                     Michael.Patton@ago.mo.gov
                                                     Benjamin.Gilberg@ago.mo.gov

23

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst, 1223911
 *Solicitor General*
Jason J. Muehlhoff*
 *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, 1204350
 *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/James R. Rodriguez*
James R. Rodriguez, 1223913
 *Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov

**LIZ MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ Kelsey L. Smith*
Kelsey L. Smith, 1214635
 *Deputy Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
Telephone: (225) 428-7432
smithkel@ag.louisiana.gov

**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan, 1208173

**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett, 1218826

24

*Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov

**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II, 1223914
*Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov

**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate, 1209409
*Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn, 1220093
*Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

/s/ *David Bryant*
David Bryant, 1222544
*Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

25

Email:                                  david.bryant@oag.texas.gov
grant.flynn@state.sd.us


/s/ *Ian D. Prior*
Ian D. Prior (Bar No. 655704)
America First Legal Foundation
611 Pennsylvania Ave S.E. No. 231
Washington, D.C. 20003
(410) 205-9681
ian.prior@aflegal.org


\* *Pro hac vice forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 4,395 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Century Schoolbook typeface.

*/s/ Louis J. Capozzi, III*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Louis J. Capozzi, III*

28