**Case Nos. 26-1774, 26-1779**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

State of California, *et al.*,
*Plaintiffs-Appellees,*

v.

Donald J. Trump, in his official capacity as President of the United States,
*et al.*,
*Defendants-Appellants,*

State of Alabama, *et al.*,
*Intervenor Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Massachusetts*
*Case No. 1:26-cv-11581*
*The Honorable Indira Talwani, District Judge*

# BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE*
# IN SUPPORT OF APPELLEES

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Inbar Pe'er
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

Allegra Chapman
Andrew J. Rising
Carlos Guevara
GOVERNORS SAFEGUARDING DEMOCRACY
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (213) 933-2126

Carey R. Dunne
Kevin Trowel
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION
GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... II

INTRODUCTION ...................................................................................................... 1

INTEREST OF AMICI ............................................................................................... 3

ARGUMENT .............................................................................................................. 6

    I.    Our System of Electoral Federalism ............................................................. 6

    II.   Electoral Federalism Confers Substantial Benefits on our Nation
         and Citizenry ................................................................................................. 8

    III.  The EO Unlawfully Forces States to Prepare for and Comply
         with Conflicting Federal and State Election Rules ..................................... 14

    IV.  State Election Officials Need Immediate Relief Well in Advance
         of the Midterm Elections. ............................................................................ 22

CONCLUSION ......................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)..............................................................................22, 25

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013)......................................................................................1

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
  576 U.S 787 (2015).................................................................................14

*City of Dania Beach, Fla. v. F.A.A.*,
  485 F.3d 1181 (D.C. Cir. 2007).............................................................23

*Cnty. of Nassau v. New York*,
  724 F. Supp. 2d 295 (E.D.N.Y. 2010) .....................................................8

*Colorado v. DeJoy*,
  No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020)..............7

*Common Cause/New York v. Brehm*,
  432 F. Supp. 3d 285 (S.D.N.Y. 2020) .....................................................8

*Cook v. Gralike*,
  531 U.S. 510 (2001).................................................................................20

*Democratic Nat'l Comm. v. Wis. State Legislature*,
  141 S. Ct. 28 (2020)................................................................................10

*Foster v. Love*,
  522 U.S. 67 (1997)...................................................................................14

*Frozen Food Exp. v. United States*,
  351 U.S. 40 (1956)...................................................................................24

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)...................................................................................6

*Ill. State Bd. Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979)...................................................................................6

ii

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................7

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022).................................................................8, 10, 25, 26

*Moore v. Harper*,
  600 U.S. 1 (2023).........................................................................................10

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014)......................................................................23

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998)......................................................................................25

*Powell v. McCormack*,
  395 U.S. 486 (1969)........................................................................................1

*Printz v. United States*,
  521 U.S. 898 (1997)........................................................................................6

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)..........................................................................................26

*Roudebush v. Hartke*,
  405 U.S. 15 (1972)..........................................................................................1

*Rucho v. Common Cause*,
  588 U.S. 684 (2019)........................................................................................2

*Sidak v. United States Int'l Trade Comm'n*,
  No. 23-5149, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026)...............................22

*Smiley v. Holm*,
  285 U.S. 355 (1932)........................................................................................2

*State v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) ...................................................................3, 7

*State of California v. Trump*,
  No. 1:26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026).................3, 25

*United States v. Weber*,
No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ........................10

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995)..............................................................................................1

*Washington v. Trump*,
814 F. Supp. 3d 1173 (W.D. Wash. 2026)..........................................................14

*Williams v. Rhodes*,
393 U.S. 23 (1968)................................................................................................6

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)..............................................................................................1

**U.S. Constitutional Provisions:**

U.S. Const., art. I, § 4, cl. 1 .............................................................................1, 7

**Statutes:**

39 U.S.C. § 403(c).............................................................................................20

52 U.S.C. § 20501 ...............................................................................................7

52 U.S.C. § 20507(a)(1) ....................................................................................17

52 U.S.C. § 20507(c)(2)(A)...............................................................................17

52 U.S.C. § 20901 ...............................................................................................7

52 U.S.C. § 21083(a)(1)(A)...............................................................................18

52 U.S.C. § 21083(a)(5)(A)(iii).........................................................................18

Mass. Gen. Laws ch. 54, § 89 ...........................................................................19

Mont. Code Ann. § 13-13-211(1) ......................................................................19

Tex. Elec. Code § 84.007(c) ..............................................................................19

**Other Authorities:**

*Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915, 32,918
(June 2, 2026)....................................................................................................24

Christopher R. Berry, *Democracy Reform Primer Series:*
*The Timing of Local Elections*, U. Chicago (Jan. 25, 2024) ..............................9

iv

Jess Brouard, *States, Not the President, Run Elections in America*,
State Court Report (Oct. 21, 2025) ..............................................................9

Jessica Bulman-Pozen, *Federalism as a Safeguard of the
Separation of Powers*, 112 Columbia L. Rev. 459 (2012) ................................15

*Election Administration at State and Local Levels*,
Nat'l Conf. of State Legislatures (Jan. 13, 2026) .............................9, 10, 13

Exec. Order No. 14,399, 91 Fed. Reg. 17,125
(Mar. 31, 2026) .............................................................2, 15, 18, 21, 23

The Federalist No. 51 (Alexander Hamilton)..............................................6

The Federalist No. 59 (Alexander Hamilton)............................................14

Jen Fifield & Zach Despart, *A Federal Tool to Check Voter
Citizenship Keeps Making Mistakes. It Led to Confusion
in Texas*, Texas Tribune (Feb. 13, 2026) .............................................16

Gallup, *Americans Trust Local Government Most,
Congress Least* (Oct. 13, 2023) ............................................................11

Lauren Miller Karalunas, *Nevada Election Board Officers:
Rules and Constraints*, Brennan Center for Justice
(March 18, 2024) ..............................................................................12

Lauren Miller Karalunas, *Ohio Precinct Election Officials:
Rules and Constraints*, Brennan Center for Justice
(March 18, 2024) ..............................................................................12

Lauren Miller Karalunas, *Pennsylvania Election Officers:
Rules and Constraints*, Brennan Center for Justice
(March 18, 2024) ..............................................................................12

Lauren Miller Karalunas, *Wisconsin Election Officers:
Rules and Constraints*, Brennan Center for Justice
(March 18, 2024) ..............................................................................12

Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*,
Nat'l Conf. of State Legislatures (Sept. 23, 2025) ..................................9

David Landau, et al., *Federalism, Democracy, and the 2020 Election*,
99 Tex. L. Rev. Online 96 (2021) .......................................................13

Mitch McConnell, *Trump Gives Democrats a Voting Gift*,
Wall St. J. (Apr. 7, 2025) ....................................................................8

Miles Parks, *Voting officials are leaving their jobs at
the highest rate in decades*, NPR (Aug. 20, 2025) ...............................................21

Pew Research Center, *On issue after issue,
Americans say things are going better locally than nationally*,
(Feb. 10, 2025)...............................................................................................11

Social Security Administration, Letter to Fair Elections Center
(July 13, 2023) ...........................................................................................16

*States with No-Excuse Absentee Voting*, Nat'l Conf.
of State Legislatures (Mar. 10, 2026) ...............................................................19

U.S. Department of Justice, Office of Juvenile Justice
and Delinquency Prevention, *Youth (0 to 17) population profile
detailed by age, sex, and race/ethnicity* (May 27, 2025) ....................................16

*Voter Registration Deadlines*, Nat'l Conf. of State Legislatures
(Oct. 13, 2025) .............................................................................................17

Wendy Weiser, *Michigan Election Inspectors:
Rules and Constraints*, Brennan Center for Justice
(March 18, 2024) ..........................................................................................12

## INTRODUCTION

Free and fair elections are the cornerstone of our constitutional system.[1]  The right to vote is "'so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution.'"  *Powell v. McCormack*, 395 U.S. 486, 534 n.65 (1969) (quoting 16 Parl.Hist.Eng. 589–90 (1769)).  Voting is a "fundamental political right," because it is "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[2]

The Constitution expressly delegates authority to the states to safeguard this right in the Elections Clause.  *See* U.S. Const., art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013); *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972).  The Clause is an "express delegation[ ] of power to the States to act with respect to federal elections," *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 805 (1995), and it provides states with

> authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards

---

[1] No party or party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund preparation or submission of this brief.  All parties to the appeal consented to the filing of this brief.

[2] Internal citations, quotation marks, and alterations are omitted from all case quotations unless otherwise noted.

1

> which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). The authority conferred by the Elections Clause is of course "checked and balanced" by Congress, but it resides "primarily" with the states. *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019).

In the experience of Amici, bipartisan former governors from across the United States, states embrace this crucial role expressly assigned to them by the Constitution. The officials who work in the 10,000 election administration jurisdictions across the United States serve with honor and a sense of obligation to their communities and to the Constitution. In Amici's experience, state and local election officials, whatever their party, are dedicated, highly competent, responsible, accountable and transparent. Even in the face of increasing threats and harassment stemming from election misinformation, state and local officials admirably discharge their duties and ensure that elections are free and fair. By design, this balanced and decentralized system serves not only as a bulwark against efforts to undermine democracy, but to foster confidence and trust among the voting public.

Amici respectfully submit that the President's March 31, 2026 Executive Order entitled "Ensuring Citizenship Verification and Integrity in Federal Election" threatens to undermine the Constitution's careful separation of powers. *See* Exec. Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) (the "Executive Order" or "EO"). The "Constitution does not spell out a role for the President in the operation of state

2

voting procedures in federal elections." *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023). Indeed, "[t]he Constitution <u>does not</u> grant the President any specific powers over elections." *State of California v. Trump*, No. 1:26-cv-11581, 2026 WL 1826490, at *3 (D. Mass. June 25, 2026). The EO therefore affords authorities to the President that he does not enjoy, all at the expense of the states and Congress, simultaneously offending the core constitutional principles of federalism *and* the separation of powers. Far from "ensuring . . . integrity in federal elections," the EO, if permitted to go into effect, will undermine trust in elections, needlessly complicate voting processes, arbitrarily disenfranchise eligible voters, and undermine states' constitutional role in ensuring free and fair elections. State election officials across the country are working now to prepare for the upcoming midterm elections, and judicial relief is necessary to provide the certainty required to administer elections that are compliant with state and federal laws.

## INTEREST OF AMICI

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and, in that capacity, were responsible for the administration of elections in their respective states. Several Amici also served as state election officials themselves, including four who served as Secretary of State prior to becoming Governor. In those roles, Amici exercised the substantial authority

3

delegated to the states by the Elections Clause and ensured the integrity and efficiency of state and federal elections within their states.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Appellees' request for relief in this case. Amici submit that the Executive Order offends the Constitution's careful balance of state and federal authority, undermines state executives' ability to ensure free and fair elections within their states, and breaks with a long tradition of cooperation between Congress and the states concerning election administration.   Amici in support of this brief are:

- Neil Abercrombie, Governor of Hawaii from 2010 to 2014.

- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019; Secretary of State of California from 1971 to 1975.

- Kate Brown, Governor of Oregon from 2015 to 2023; Secretary of State of Oregon from 2009 to 2015.

- Steve Bullock, Governor of Montana from 2013 to 2021.

- Arne Carlson, Governor of Minnesota from 1991 to 1999.

- Chet Culver, Governor of Iowa from 2007 to 2011; Secretary of State of Iowa from 1999 to 2007.

- Mark Dayton, Governor of Minnesota from 2011 to 2019.

- Parris Glendening, Governor of Maryland from 1995 to 2003.

4

- Jennifer Granholm, Governor of Michigan from 2003 to 2011.

- Bill Graves, Governor of Kansas from 1995 to 2003; Secretary of State of Kansas from 1987 to 1995.

- Christine Gregoire, Governor of Washington from 2005 to 2013.

- John Kitzhaber, Governor of Oregon from 1995 to 2003 and 2011 to 2015.

- Gary Locke, Governor of Washington from 1997 to 2005.

- Jack Markell, Governor of Delaware from 2009 to 2017.

- Terry McAuliffe, Governor of Virginia from 2014 to 2018.

- Martin O'Malley, Governor of Maryland from 2007 to 2015.

- Deval Patrick, Governor of Massachusetts from 2007 to 2015.

- Pat Quinn, Governor of Illinois from 2009 to 2015.

- Marc Racicot, Governor of Montana from 1993 to 2001.

- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.

- Steve Sisolak, Governor of Nevada from 2019 to 2023.

- Eliot Spitzer, Governor of New York from 2007 to 2008.

- Tom Vilsack, Governor of Iowa from 1999 to 2007.

- Bill Weld, Governor of Massachusetts from 1991 to 1997.

- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.

- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

5

## ARGUMENT

Our system of constitutional federalism safeguards liberty.  "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people."  *Printz v. United States*, 521 U.S. 898, 919–20 (1997).  This "healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front."  *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  Federalism may on occasion be cumbersome, but the Founders understood that, through the dispersion of authority, "a double security arises to the rights of the people."  The Federalist No. 51 (Alexander Hamilton).

This general principle applies with particular force in the context of elections.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Williams v. Rhodes*, 393 U.S. 23, 31 (1968).  Voting, and therefore free and fair elections, are "of the most fundamental significance under our constitutional structure."  *Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

## I.     Our System of Electoral Federalism

The Constitution expressly delegates primary authority over elections to the states, subject to congressional—not federal executive—oversight.  The Elections

6

Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.

The federal executive has no constitutional role in election administration beyond the enforcement of laws enacted by Congress pursuant to its Election Clause authority. *See Meadows*, 88 F.4th at 1346–47. Indeed, "executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025). The federal executive has no authority to interfere with, much less override, state authority to regulate elections. *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (holding that the Postal Service, as an executive agency of the federal government, does not have authority to override state election laws).

Federal statutes enacted pursuant to Congress's authority under the Elections Clause respect this constitutional structure and preserve, rather than undermine, states' authority to administer elections. The National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, for example, together establish a "floor" for federal election administration standards, preserving state officials' discretion to determine

7

appropriate implementation mechanisms that meet the needs of their state and citizenry.[3] In the NVRA and HAVA, Congress confirmed through law what Amici know from experience—that election administration requires the kind of flexibility and local knowledge that state and local officials possess, and that federal officials do not.[4]

## II. Electoral Federalism Confers Substantial Benefits on our Nation and Citizenry

In Amici's experience, the default rule of state control established by the Elections Clause promotes and protects free and fair elections. Because the Constitution has delegated election authority to states since the Founding, states have developed deep practical and institutional expertise in managing the "extraordinarily

---

[3] *See, e.g.*, *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 317 (S.D.N.Y. 2020) (discussing *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 762 (2018), and explaining that "the NVRA sets the floor for how states conduct list maintenance; states have discretion to choose how precisely to follow its requirements," and "[s]tates take a variety of approaches in complying with the NVRA's requirements"); *Cnty. of Nassau v. New York*, 724 F. Supp. 2d 295, 298 (E.D.N.Y. 2010) (noting that relevant provisions in HAVA "set[] minimum requirements for federal elections," and that "[t]he specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.").

[4] *See* Mitch McConnell, *Trump Gives Democrats a Voting Gift,* Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's Elections."); *id.* ("[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols.").

complicated" task of running statewide elections. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay). The overwhelming majority of elections conducted in the United States every year are for state and local offices,[5] and many occur during odd numbered years, completely independent from even-year federal elections.[6] The actual work of running these elections is done by local officials in the more than 10,000 election administration jurisdictions across the country.[7]

---

[5] *See, e.g.*, Jess Brouard, *States, Not the President, Run Elections in America*, State Court Report (Oct. 21, 2025), https://statecourtreport.org/our-work/analysis-opinion/states-not-president-run-elections-america (noting that 2026 midterm elections will be for "all 435 House seats, 33 Senate seats, and thousands of state legislature seats across the country").

[6] *See, e.g.*, Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*, Nat'l Conf. of State Legislatures (Sept. 23, 2025), https://www.ncsl.org/state-legislatures-news/details/for-an-odd-year-2025-packs-big-elections (discussing 2025 state-level elections in Virginia and New Jersey, and 2027 elections in Kentucky, Louisiana, and Mississippi); Christopher R. Berry, *Democracy Reform Primer Series: The Timing of Local Elections*, U. Chicago (Jan. 25, 2024), https://effectivegov.uchicago.edu/primers/the-timing-of-local-elections ("Most local elections are held off-cycle, on separate days from higher profile state and federal elections."). It may be, as Prof. Berry notes, that holding local elections in odd-numbered years is a significant factor in low turnout for those elections, but that point does not undermine the broader point about local experience and expertise in running free and fair elections. *See, e.g.*, *id.* ("In Nassau County, New York, for example, local elections take place on 24 different dates scattered throughout 11 months of the calendar year; none of them coinciding with major state or federal elections in November.").

[7] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

This decentralized system "allows individual jurisdictions to experiment and innovate—to see how elections might best be run for the state and the locality's particular circumstances."[8]  Elections require "enormous advance preparations by state and local officials, and pose significant logistical challenges" that state officials are uniquely qualified and situated to address. *Milligan*, 142 S. Ct. at 880.  In Amici's experience, states admirably discharge their responsibility for establishing "rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots." *Moore v. Harper*, 600 U.S. 1, 29 (2023).  State officials exercise their discretion under the Elections Clause to make countless "difficult decisions about how best to structure and conduct elections" that reflect their respective state's varying needs and priorities. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31–32 (2020) (Kavanaugh, J., concurring).

Amici submit that our system of electoral federalism also increases trust among the electorate.  "State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for." *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at \*2 (C.D. Cal. Jan. 15,

---

[8] *Id.*

10

2026).  This is borne out in survey data, which demonstrates that Americans view their state and local officials far more positively than federal officials,[9] and that they have substantially more trust and confidence in state and local officials as compared to federal officials.[10]  In this era of rampant election misinformation, the authority exercised by the states under the Elections Clause serves as a bulwark against the further erosion of public confidence in our electoral system.

As both a cause and a consequence of these features, state and local election administration is also less partisan than the current national discussion about elections would suggest.  Many states, including states in which Amici served as governors, have regulations that specifically address partisanship, and give both major political parties an equal role in ensuring the integrity of state-run elections. In Michigan, for example, election inspectors are employed by local county clerks, and each clerk must have at least one inspector from each major political party.  And at voting locations, while voting is ongoing, many tasks must be completed by bipartisan pairs of election workers, including "assisting voters who request

---

[9] *See* Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025), https://www.pewresearch.org/short-reads/2025/02/10/on-issue-after-issue-americans-say-things-are-going-better-locally-than-nationally/.

[10] *See* Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023), available at https://news.gallup.com/poll/512651/americans-trust-local-government-congress-least.aspx.

11

instruction after entering a voting station; opening any electronic tabulating equipment during the day to ensure its proper operation; sealing ballot containers, electronic devices, or any other election materials; and delivering documents and sealed ballots after the polls close."[11] Nevada,[12] Ohio,[13] Pennsylvania,[14] and Wisconsin,[15] to name just a few examples of states in which Amici have served as governors, have laws that similarly require bipartisan cooperation in election administration and monitoring.

---

[11] *See generally* Wendy Weiser, *Michigan Election Inspectors: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/michigan-election-inspectors-rules-and-constraints.

[12] *See generally* Lauren Miller Karalunas, *Nevada Election Board Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/nevada-election-board-officers-rules-and-constraints.

[13] *See generally* Lauren Miller Karalunas, *Ohio Precinct Election Officials: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/ohio-precinct-election-officials-rules-and-constraints.

[14] *See generally* Lauren Miller Karalunas, *Pennsylvania Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/pennsylvania-election-officers-rules-and-constraints.

[15] *See generally* Lauren Miller Karalunas, *Wisconsin Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/wisconsin-election-officials-rules-and-constraints.

Finally—and critically—"[t]he dispersed responsibility for running elections also makes it extremely difficult, if not impossible, to rig U.S. elections at the national level."[16]  In the election context,

> states do not just serve as 'guard dogs' for any federal misbehavior or as governments that compete with the federal government for voter affection.  Instead, states remain significantly functionally independent of, and resistant to capture by, the Executive Branch due to a uniquely American mix of tradition, doctrine, and resource constraints.[17]

This system is occasionally inefficient, but it makes the risk of partisan capture "far less likely" and acts as a "reasonably effective bulwark against efforts by an authoritarian president to make the overall electoral playing field unfair."[18]

Thanks to the Founders' forethought, the division of authority established by the Elections Clause continues to confer benefits on our nation, states, and citizenry. The primacy of state lawmaking and state lawmakers in this area "allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic

---

[16] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

[17] David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96, 100 (2021).

[18] *Id.* at 104.

processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S 787, 817 (2015). Amici respectfully submit that our system of electoral federalism is a cornerstone of our democracy and we—the courts, elected officials at all levels of government, and citizens—should zealously defend it.

## III. The EO Unlawfully Forces States to Prepare for and Comply with Conflicting Federal and State Election Rules

Against this backdrop, the EO is unlawful and unwise. It offends the basic constitutional principle that the federal executive has no role in the regulation of elections. *See* The Federalist No. 59 (Alexander Hamilton) (noting that the Constitution "submitted the regulation of elections for the federal government, in the first instance, to the local administrations" and only authorizes Congress "in the last resort" to further regulate federal elections); *Foster v. Love*, 522 U.S. 67, 69 (1997) (explaining that the Elections Clause "invests the States with responsibility for the mechanics of congressional elections" and only Congress has the authority to preempt state legislative choices); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 n.57 (W.D. Wash. 2026) ("Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections."). And it undermines the very structure of our constitutional system.

14

"[F]ederalism and the separation of powers diffuse government authority to prevent the accumulation of excessive power in any one actor and to encourage different representatives of the people to monitor the exercises of power by the others." Jessica Bulman-Pozen, *Federalism as a Safeguard of the Separation of Powers*, 112 Columbia L. Rev. 459, 460 (2012). The EO, issued by the President unilaterally and without deliberation, is offensive to *both* of these core constitutional principles. It purports to strip states of their explicit constitutional authority to regulate elections subject only to congressional—not executive—oversight, and, in displacing longstanding state authority over elections, it will cause confusion among voters and election administrators alike, risking widespread arbitrary disenfranchisement of eligible voters. If the EO is permitted to stand, it will increase the authority of the federal executive at the expense of the states, Congress, and the constitutional order that has maintained our electoral democracy for 250 years.

Sections two and four of the EO purport to transfer responsibility for assessing voter eligibility from localities with substantial experience administering elections to DHS, which has no experience administering elections and which is less transparent, less accountable, and less accessible to voters than state or local election officials. For instance, the EO requires DHS to compile and provide to states a "State Citizenship List" based on federal databases, including Social Security Administration (SSA) data, just 60 days before elections. *See* E.O. § 2(a). While

15

this list will purport to include all eligible voters, it will almost certainly exclude—

and thus disenfranchise—significant numbers of eligible voters, such as elderly

citizens who may not be properly tagged as citizens in SSA databases,[19] and

individuals who were born abroad to U.S citizen parents or became naturalized U.S.

citizens.[20]

Moreover, irrespective of which federal databases are used to compile this list,

it will be outdated by the time it is compiled. Because the EO requires DHS to share

State Citizenship Lists at least 60 days before an election, the lists will necessarily

exclude individuals who are not of voting age at the time of the list's creation, but

who will have turned 18 by Election Day—a group comprising several hundred

thousand Americans each year.[21] The lists would also exclude individuals who

---

[19] *See* Social Security Administration, Letter to Fair Elections Center (July 13, 2023), https://perma.cc/KS2N-U2US.

[20] *See* Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Texas Tribune (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

[21] As of 2023, there were more than 4 million Americans in each age cohort from six years old to 17 years old. Accordingly, for at least the next decade, approximately 11,000 Americans will turn 18 each day (4m 17 year olds / 365 days per year = an average of 10,958 birthdays per day) and, on average, more than 650,000 Americans will turn 18 in any given 60-day period, including the 60 days before Election Day. *See* U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *Youth (0 to 17) population profile detailed by age, sex, and race/ethnicity* (May 27, 2025), available at https://ojjdp.ojp.gov/statistical-briefing-book/population/faqs/qa01104.

become naturalized citizens during the 60-day window preceding Election Day.  In other words, entire populations of newly eligible voters will be missing from the DHS lists, potentially disenfranchising them in the first election in which they are eligible to cast a ballot.  And given the mobility of the voting age population, it is possible that otherwise eligible voters who move to a different state during this 60-day window will fall through the cracks and be excluded from their new state's DHS list.  Indeed, most states permit citizens to update or change an address either 30 days before an election or on Election Day itself,[22] and the NVRA requires that states set their voter registration deadlines for federal elections *no more than* 30 days before an election.  *See* 52 U.S.C. § 20507(a)(1).

In Amici's experience, reliance on these outdated and inaccurate DHS lists is likely to disenfranchise significant numbers of eligible voters and cause confusion for state and local election administrators attempting to navigate contradictory directives regarding their authority to maintain accurate voter rolls.  For instance, under the NVRA, states are prohibited from systematically removing individuals from voter rolls *within 90 days* of an election.  *See* 52 U.S.C. § 20507(c)(2)(A).  Yet the EO seeks to do exactly that by establishing centralized State Citizenship Lists

---

[22] *Voter Registration Deadlines*, Nat'l Conf. of State Legislatures (Oct. 13, 2025), https://www.ncsl.org/elections-and-campaigns/voter-registration-deadlines.

only *60 days* before an election and compelling states to purge their voter rolls accordingly, under threat of federal prosecution.

Similarly, HAVA requires "each *State*, acting through the chief State election official" to implement a single "statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). To establish a single list, "[t]he *State* shall determine whether the information provided by an individual is sufficient to meet the requirements" to register to vote. 52 U.S.C. § 21083(a)(5)(A)(iii) (emphasis added). In other words, Congress only authorized state and local election officials to make voter registration decisions and maintain voter rolls; the EO's contradictory directives concerning a federal list of eligible voters will confuse election administrators and undermine the decentralized election systems that have historically been successful in implementing free and fair elections. Indeed, the centralized citizenship lists contemplated by the EO will undermine the substantial benefits of our decentralized election system and create the possibility of serious errors or malfeasance that will deprive eligible citizens of their right to vote.

Section three of the EO also undermines the right to vote of citizens who vote by mail. It requires states to provide lists of eligible mail-in voters 60 days before Election Day and directs the U.S. Postal Service ("USPS") not to deliver mail ballots from voters who do not appear on those lists. *See* E.O. § 3(b). Most states permit

18

no-excuse absentee voting by mail and those that do not either conduct all elections by mail or permit qualified voters to vote by absentee ballot.[23] Mail-in and absentee voting ensure that citizens living abroad (including members of the military stationed outside the United States), those who are disabled, or those who know they will be traveling at the time of an election, are able to exercise their fundamental right.

Most states allow eligible voters to request mail-in ballots shortly before Election Day, and certainly much closer than 60 days before Election Day. These longer timeframes to apply for mail-in ballots provide voters flexibility if their schedules change and no longer allow for them to vote in person. By way of example, Massachusetts allows voters to request absentee ballots up until five days before Election Day, *see* Mass. Gen. Laws ch. 54, § 89; Texas allows voters to apply for mail-in ballots up to 11 days before an election, *see* Tex. Elec. Code § 84.007(c); and Montana allows voters to request an absentee ballot as late as the day preceding Election Day, *see* Mont. Code Ann. § 13-13-211(1). But the EO attempts to displace these carefully crafted state statutes by requiring that voters necessarily request mail-in ballots *over 60 days* before an election so that they will be included on the EO's

---

[23] *States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.

mail-in voter lists. This onerous 60-day mail-in ballot application deadline will disenfranchise large swaths of voters who would otherwise be entitled to request a mail-in ballot under state law, and create confusion among voters and election officials attempting to navigate conflicting federal and state ballot application deadlines.

The EO improperly recruits USPS into making substantive judgments about who may vote using an absentee ballot, displacing state and local election officials who have the constitutional authority—and the necessary experience—to regulate absentee balloting procedures. The EO purports to authorize USPS to decline delivery of otherwise deliverable mail-in ballots merely because the sender does not appear on the federal list, without regard for whether the sender is *in fact* eligible to vote, in direct violation of the agency's longstanding statutory universal service obligation. *See* 39 U.S.C. § 403(c). And it inexplicably requires USPS—which has no experience administering elections—to establish rules regulating the design of mail-in ballots that, ultimately, must be processed and tabulated by state and local election officials. The EO's delegation of authority to USPS to regulate mail-in balloting not only violates basic principles of federalism, *see Cook v. Gralike*, 531 U.S. 510, 523 (2001) (Elections Clause grants states "broad power to prescribe the procedural mechanisms for holding congressional elections"), it also risks

20

disenfranchising the significant number of voters who rely on mail-in balloting to exercise their fundamental right to vote.

Finally, the EO's explicit threat of criminal investigation and prosecution against state and local election officials will predictably undermine, rather than enhance, the administration of federal elections. *See* E.O. §§ 2(b), 5.[24] Against that backdrop, the prospect of federal criminal scrutiny for carrying out routine election administration activities, including the mere "printing, production, shipment, or distribution of ballots"—entirely in accordance with existing federal and state laws—will only exacerbate these challenges. E.O. § 2(b). Faced with ambiguous federal directives and the risk of personal criminal liability, election officials may decline to serve altogether, impairing the timely and effective administration of elections. The Constitution's delegation of election administration to the states reflects a judgment that state and local officials—who are most accountable to their communities—are best positioned to perform these functions. A regime that chills those officials through the threat of prosecution not only disrupts that constitutional design but also creates a substantial risk of administrative breakdown and voter disenfranchisement.

---

[24] Turnover among election officials has already been increasing in recent years due to pressure and harassment. *See* Miles Parks, *Voting officials are leaving their jobs at the highest rate in decades*, NPR (Aug. 20, 2025), https://www.npr.org/2025/08/20/nx-s1-5503954/turnover-election-officials-trump.

**IV.    State Election Officials Need Immediate Relief Well in Advance of the Midterm Elections.**

The Court should reject the government's principal argument that Appellees' claims are not ripe and any harms are speculative.  Amici, relying on their vast collective experience administering elections, submit that the government's ripeness argument misunderstands the realities of election administration and the significant hardship that will befall state and local election officials absent immediate judicial review of the EO.  Election administration requires months of advance planning, including updating voter registration databases, programming and testing voting systems, printing ballots and election materials, training poll workers, coordinating with vendors, and educating voters regarding important deadlines.  State and local officials and election administrators must prepare *now* for the midterm elections, and uncertainty regarding the need to comply with the EO in the face of contradictory state and federal law will create confusion among election administrators and strain already limited state and local resources.

The ripeness doctrine turns not only on whether an injury has already occurred, but also on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Sidak v. United States Int'l Trade Comm'n*, No. 23-5149, 2026 WL 1110981, at *4, --- F.4th ---- (D.C. Cir. Apr. 24, 2026) (noting that "the Supreme

22

Court has not disposed of a case purely on prudential ripeness in many years," applying *Abbot Labs* test, and holding that case was ripe in part in light of hardship enforcement would cause to plaintiff).  Amici submit that these considerations strongly favor immediate review of the EO to provide state and local election officials (and voters) with certainty ahead of the midterm elections.

First, the issues presented are fit for judicial review.  Under the EO, "rights or obligations have been determined" contrary to the Constitution's careful allocation of authority, and "legal consequences will flow" from its directives.  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  Nothing in the EO suggests that its "conclusions are tentative, open to further consideration, or conditional on future agency action." *City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1188 (D.C. Cir. 2007).

Indeed, the EO's concrete directives and timelines are *already* shaping the conduct of federal and state actors.  For example, the EO's directive that DHS create State Citizenship Lists based on SSA records and SAVE data and then transmit those lists to state election officials no fewer than 60 days before Election Day is not an abstract musing; it is an operational command that has set in motion immediate planning and coordination across multiple government agencies.  Similarly, the EO directs the USPS to create lists of eligible mail-in voters and mandates that "USPS *shall* not transmit mail-in or absentee ballots" from individuals who are not listed.

E.O. § 3(b)(iii) (emphasis added).  The precise details of how the DHS and USPS voter lists will be generated are not necessary to conclude that these directives blatantly violate the right of states to determine the "time, place, and manner" of federal elections, subject only to Congress's oversight.  Further agency action is not necessary to determine whether the President—without congressional approval—can create lists of eligible voters and mail-in voters, and compel states to use those lists under threat of prosecution.  Indeed, USPS has already begun to implement the EO by publishing a proposed rule requiring rejection of outbound ballot mailings before they reach voters in States that refuse to acquiesce to the President's unlawful commands.  *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915, 32,918 (June 2, 2026).  Amici submit that the constitutionality of the EO is fit for judicial review now.

Second, Amici—drawing on their substantial collective experience administering elections—submit that the hardship on state and local election officials of withholding judicial review at this time cannot be overstated.  A case is ripe for a judicial decision when government conduct has "an immediate and practical impact" on regulated parties.  *Frozen Food Exp. v. United States*, 351 U.S. 40, 44 (1956).  This is particularly true where, as here, the challenged action "requires an immediate and significant change in the plaintiffs' conduct of their

affairs with serious penalties attached to noncompliance." *Abbott Labs.*, 387 U.S. at 153.

The EO "command[s]" states and federal agents to take action, it "grant[s]" authority to federal agents that is reserved to the states by the Constitution, and simultaneously "withhold[s]" that authority from the states, it "subject[s]" state officials to "civil [and] criminal liability," and it "create[s] . . . legal rights [and] obligations." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). As Amici know from years of experience, election administration is an inherently forward-looking enterprise that requires many months of advance planning. State and local officials "need substantial time to plan for elections" which are "extraordinarily complicated and difficult" and "require enormous advance preparations … and pose significant logistical challenges." *Milligan*, 142 S. Ct. at 880. Preparations—all of which would be impacted by the EO—are already underway, including designing mail-in ballots, configuring voter registration systems, and educating voters about applicable rules and deadlines. *See State of California v. Trump*, No. 1:26-cv-11581, 2026 WL 1826490, at *7 (D. Mass. June 25, 2026) ("Nearly half of Plaintiff States have already purchased mail ballot envelopes for the 2026 federal election cycle that will not be in compliance with the requirements the EO has directed USPS to adopt by rulemaking."). State and local officials cannot wait until the eve of the upcoming elections—or until after federal

25

agencies finalize implementation of the EO—to alter longstanding procedures to comply with the EO's (unlawful) federal directives.

The government's suggestion that impacted parties can simply wait to challenge any future implementing action ignores the substantial harm that last-minute litigation would cause. Election administration is uniquely sensitive to timing, and judicial intervention at the last minute can itself undermine free and fair elections. *See Milligan*, 142 S. Ct. at 880–81 ("Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others."); *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."). By the time agency action is "final," in the sense the government seemingly demands, the electoral machinery will have long been in motion, and meaningful judicial relief will be impracticable.

## CONCLUSION

For the reasons set forth above, Amici respectfully assert that the Executive

Order is unconstitutional and should be enjoined.

DATED: July 13, 2026

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Inbar Pe'er*
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Allegra Chapman
Andrew J. Rising
Carlos Guevara
GOVERNORS SAFEGUARDING
DEMOCRACY
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

*Counsel for Bipartisan Former Governors*

/s/ *Mónica Folch*
Mónica Folch
    *Counsel of Record*
Carey R. Dunne
Kevin Trowel
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

---

* *Bar admission pending*

27

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type-volume requirements of Federal Rule of Appellate Procedure 32. The brief contains 6,033 words and was prepared with 14-point proportionally spaced serif typeface using Microsoft Word.

DATED: July 13, 2026

*/s/ Mónica Folch*
Mónica Folch

## CERTIFICATE OF SERVICE

I certify that on July 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

DATED: July 13, 2026

*/s/ Mónica Folch*
Mónica Folch